No. 26-3060

IN THE
United States Court of Appeals for the Tenth Circuit

ANTHONY ALVAREZ,

*Plaintiff-Appellee,*

v.

EMILY CHELLGREN,

*Defendant-Appellant.*

On Appeal from the
United States District Court for the District of Kansas

Case No. 2:25-cv-02281-KHV-TJJ
The Honorable Kathryn H. Vratil

BRIEF FOR APPELLANT

MICHAEL T. RAUPP
DEREK T. TEETER
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
michael.raupp@huschblackwell.com

*Attorneys for Defendant-Appellant*

June 25, 2026                    ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...............................................................iv

PRIOR OR RELATED APPEALS...........................................................vii

JURISDICTIONAL STATEMENT.............................................................1

STATEMENT OF ISSUES.................................................................2

STATEMENT OF THE CASE ..............................................................2

    I.    Factual Background...................................................2

    II.   Procedural History...................................................6

SUMMARY OF THE ARGUMENT ............................................................9

ARGUMENT...........................................................................11

    I.    Standard of Review...............................................11

        A.    Procedural standard. .......................................11

        B.    Substantive qualified immunity standard. .................13

    II.   Alvarez Failed To Assert A Valid Constitutional Violation. .........................................................17

        A.    Alvarez's speech is not actionable if made pursuant to his official duties......................18

        B.    Alvarez's speech to KCUR was made pursuant to his official duties as a proctor.....................23

            1.    KCUR identified Alvarez as a proctor, and the article's discussion of him was inseparable from that role..................24

            2.    The Media-Referral Policy made handling media inquiries part of Alvarez's official duties, and he admittedly violated it.................25

3. Alvarez's speech criticized, and announced his refusal to enforce, a policy of the department that employed him. ..........................28

C. The district court's contrary analysis cannot withstand scrutiny. ...................................................31

1. The district court erred in disregarding the Media-Referral Policy and Alvarez's written job duties. ..........................................................31

2. The court's "different dorm" rationale is both factually wrong and legally beside the point. ................................................................36

III. Alvarez Failed To Meet His Burden To Proffer A Clearly Established Constitutional Violation. .......................41

A. No Supreme Court or Tenth Circuit precedent put Ms. Chellgren on notice that discipline for violation of the Media-Referral Policy violated the First Amendment. ..........................................................43

B. The district court defined the right at the highest level of generality and grounded its analysis in the same flawed "different dorm" reasoning. ..............46

1. The district court generalized away the particularization requirement. ...........................47

2. The district court's "different dorm" reasoning is doubly defective on this prong of the qualified immunity analysis. ....................52

C. Timmins illustrates that the law was changing in the run-up to Ms. Chellgren's conduct, and the pre-Timmins authority the district court actually relies upon speaks only at the highest level of generality. ................................................................53

1.  Timmins illustrates that this Circuit's official-duties doctrine was still in motion in late 2025, which forecloses any clearly-established showing for conduct in March 2025. ...............................................54

2.  To the extent Alvarez reads pre-Timmins law as already articulating the Timmins rule, he is wrong; and to the extent Timmins broke new ground, qualified immunity must apply. ........................................56

3.  The pre-Timmins authority the district court actually invokes—Garcetti, Lane, and Klaassen—speaks only at the highest level of generality and, where particularized at all, supports Ms. Chellgren. ...............................58

CONCLUSION ....................................................................64

STATEMENT REGARDING ORAL ARGUMENT ...............................65

CERTIFICATE OF COMPLIANCE ......................................................66

CERTIFICATE OF DIGITAL SUBMISSION .........................................67

CERTIFICATE OF SERVICE..............................................................68

ATTACHMENT:

*Alvarez v. University of Kansas, et al.* 2:25-cv-02281-KHV-JBW
       Memorandum and Order (3/18/2026) (ECF No. 39)........Att.1

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.M. v. Holmes,*
830 F.3d 1123 (10th Cir. 2016) ......................................................54

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ......................................................................14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ......................................................................12

*Avant v. Doke,*
104 F.4th 203 (10th Cir. 2024)..............................................48, 60

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ......................................................................12

*Brammer-Hoelter v. Twin Peaks Charter Academy,*
492 F.3d 1192 (10th Cir. 2007) ..........................................54, 55, 57

*Brown v. City of Tulsa,*
124 F.4th 1251 (10th Cir. 2025)....................................................13

*Brown v. Montoya,*
662 F.3d 1152 (10th Cir. 2011) ................................................12, 13

*Casey v. West Las Vegas Independent School District,*
473 F.3d 1323 (10th Cir. 2007) ....................................................30

*Chavez-Rodriguez v. City of Santa Fe,*
596 F.3d 708 (10th Cir. 2010) ................................................54, 57

*Cuervo v. Sorenson,*
112 F.4th 1307 (10th Cir. 2024)....................................................13

*Cummings v. Dean,*
913 F.3d 1227 (10th Cir. 2019) ....................................................53

*District of Columbia v. Wesby,*
583 U.S. 48 (2018) ....................................................15, 16, 48, 60

*Eravi v. City Comm'n of Lawrence, Kan.,*
2026 WL 1412970 (10th Cir. 2026)....................12, 13, 14, 16, 43

*Estate of Ceballos v. Husk*,
919 F.3d 1204 (10th Cir. 2019) ............................................... 15, 16

*Frey v. Town of Jackson, Wyo.*,
41 F.4th 1223 (10th Cir. 2022)............................. 12, 13, 14, 17, 42

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ............................. 18, 20, 21, 22, 25, 27, 30, 59

*GFF Corp. v. Associated Wholesale Grocers*,
130 F.3d 1381 (10th Cir. 1997) ................................................5, 32

*Heard v. Dulayev*,
29 F.4th 1195 (10th Cir. 2022)...................................... 14, 58

*Hurst v. Lee Cnty., Miss.*,
764 F.3d 480 (5th Cir. 2014) ........................................21, 34, 35, 51

*Irizarry v. Yehia*,
38 F.4th 1282 (10th Cir. 2022)..................................................... 12

*Klaassen v. Atkinson,*
348 F. Supp. 3d 1106 (D. Kan. 2018)................................29, 45, 60

*Knopf v. Williams*,
884 F.3d 939 (10th Cir. 2018) ......... 19, 20, 21, 24, 27, 44, 45, 54, 57

*Lane v. Franks*,
573 U.S. 228 (2014) .............................................. 19, 20, 26, 56, 59

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023)....................................................32

*McCoy v. Meyers*,
887 F.3d 1034 (10th Cir. 2018) ...................................................55

*Messerschmidt v. Millender*,
565 U.S. 535 (2012) ...................................................................53

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) .....................................................................2

*Mullenix v. Luna*,
577 U.S. 7 (2015)14, 15, 43, 44, 46, 47, 48, 49, 50, 51, 56, 59, 62, 64

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) .............................................................. 18, 25

*Reichle v. Howards,*
566 U.S. 658 (2012) .............................................................56, 58, 63

*Samuelson v. LaPorte Cmty. School Corp.,*
526 F.3d 1046 (7th Cir. 2008) .....................................21, 35, 36, 51

*Sarkar v. McCallin,*
636 F.3d 572 (10th Cir. 2011) ....................................................55

*Saucier v. Katz,*
533 U.S. 194 (2001) ....................................................................64

*Shepherd v. Robbins,*
55 F.4th 810 (10th Cir. 2022).................................................14, 43

*Surat v. Klamser,*
52 F.4th 1261 (10th Cir. 2022).....................................................16

*Timmins v. Plotkin,*
157 F.4th 1275 (10th Cir. 2025). 9, 19, 20, 21, 22, 23, 25, 27, 44, 55,
56, 57, 59, 61, 63

*Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.,*
107 F.4th 1121 (10th Cir. 2024)…..............................20, 21, 26, 32

*Watts v. United States,*
394 U.S. 705 (1969) ....................................................................47

*White v. Pauly,*
580 U.S. 73 (2017) ...............................................15, 16, 46, 48, 59

*Wieber v. Porter,*
2025 WL 635753 (10th Cir. 2025)................................47, 48, 59, 60

*Wilson v. Layne,*
526 U.S. 603 (1999) ...................................46, 51, 55, 56, 58, 62, 63

*Works v. Byers,*
128 F.4th 1156 (10th Cir. 2025)..............................................14, 43

Statutes

28 U.S.C. § 1331.............................................................................1

42 U.S.C. § 1983......................................................................1, 7, 13

# PRIOR OR RELATED APPEALS

None.

# JURISDICTIONAL STATEMENT

Plaintiff-Appellee Anthony Alvarez filed this lawsuit against the University of Kansas ("KU") and two KU Housing & Residence Life officials—Emily Chellgren and Sarah Waters—initially in their official capacities. Aplt. App. 5. After Defendants moved to dismiss, Alvarez amended his complaint to drop all claims against KU and to convert the claims against Ms. Chellgren and Ms. Waters into individual-capacity claims for damages and fees. *See* Aplt. App. 15-63. Ms. Chellgren, then KU's Assistant Director of Housing and Residence Life, is the Appellant here.

The district court has federal question jurisdiction over this case under 28 U.S.C. § 1331 because Alvarez brought claims against Ms. Chellgren and Ms. Waters in their individual capacities under 42 U.S.C. § 1983. On March 18, 2026, the district court entered a Memorandum and Order on Defendants' motions to dismiss. Aplt. App. 139-53. The Order sustained Ms. Chellgren's motion to dismiss as to Counts One and Three of the First Amended Complaint, sustained Ms. Waters' motion in full, and overruled Ms. Chellgren's motion as to Count Two (First Amendment retaliation). Aplt. App. 153.

The district court's ruling on Ms. Chellgren's motion to dismiss included a denial of qualified immunity on Count Two. Aplt. App. 151. That ruling is subject to immediate interlocutory appeal under the collateral order doctrine. *See generally Mitchell v. Forsyth*, 472 U.S. 511 (1985). Ms. Chellgren timely filed her notice of appeal. Aplt. App. 154.

## STATEMENT OF ISSUES

I.  Whether the district court erred in denying qualified immunity to Ms. Chellgren on Alvarez's claim for First Amendment retaliation.

## STATEMENT OF THE CASE

### I.  Factual Background[1]

During the 2024-25 academic year, KU employed Anthony Alvarez as a "Proctor" at KU's Grace Pearson Scholarship Hall. Aplt. App. 55. Alvarez alleged that the role of a Proctor "is similar to a Resident Assistant." *Id.* By Alvarez's own admission, his employment expectations required him to "demonstrate a commitment to personal integrity, such as modeling good judgment, ethical behavior, and adherence to laws and policies," and to "refer a student's parents, relatives, friends, and/or the

---

[1] As required in this procedural posture, Ms. Chellgren accepts the well-pleaded allegations of the First Amended Complaint as true solely for purposes of this appeal.

media (press) to [his] supervisor" because, "[u]nless otherwise designated, the Director of Residence Life in conjunction with KU Strategic Communications & Public Affairs [would] respond to all media inquiries." Aplt. App. 56 (that policy is hereinafter referred to as the "Media-Referral Policy").

In Spring 2025, KU announced policy changes that would take effect in the upcoming 2025-26 academic year. Aplt. App. 55. Specifically, in response to changes in state and federal law, KU announced that Grace Pearson would "eliminate the hall's gender-neutral bathroom and any gender-inclusive room assignments"; additionally, KU would "require students to use the bathroom that aligns with the gender listed in their KU student files." Aplt. App. 55, 141.

In February 2025, the KCUR news service interviewed Alvarez about the policy changes, and Alvarez's statements in that interview were subsequently published in the KCUR article, which specifically identified Alvarez as a Proctor. Aplt. App. 55. On February 27, 2025, KCUR published the article entitled "KU students protest housing changes they say will harm trans and nonbinary residents." *Id.* The article identified Plaintiff as a Grace Pearson resident, identified him as

transgender, and described him as a "proctor"—a role the article said was "similar to a resident assistant." Aplt. App. 55-56. In the article, Plaintiff discussed meetings with his KU supervisors about his proctor role for the 2025-26 academic year, recounting that "[t]hey told me that they weren't confident that I would implement the policies that they were going to change at GP," and that "they were worried I was going to be frustrated and because they were changing the policies." Aplt. App. 142. Plaintiff confirmed he was "turning down the offer to work at another residence hall, and . . . moving out of student housing," and described the broader response of the affected students this way: "Currently, the plan is for people to stay . . . as we continue to fight. Because this is definitely a political decision." *Id.*[2]

---

[2] In full, the relevant portion of the Article reads as follows:

> Alvarez worked as a proctor, which he said is similar to a resident assistant, at GP. He said he applied to serve as a proctor in GP again for the 2025-26 school year, but he was assigned to a different residence hall. He said he asked his bosses about the new assignment.

> "They told me that they weren't confident that I would implement the policies that they were going to change at GP," he said. "At a more personal meeting I had with someone higher in housing, they told me it's because they were worried I was going to be frustrated and because they were changing the policies."

About a week after KCUR published the article, Plaintiff met with the Director of Grace Pearson and Defendant-Appellant Emily Chellgren—then KU's Assistant Director of Housing and Residence Life—on March 7, 2025 and was placed on employment probation. Aplt. App. 56. On March 13, 2025, Plaintiff received a hand-delivered letter from Ms. Chellgren documenting the March 7 meeting; the three topics discussed all related to Plaintiff's comments published in the article and

---

. . .

> Alvarez said he's turning down the offer to work at another residence hall, and he's moving out of student housing. But he said several other students are staying to try to preserve the community they've built.
>
> "Currently, the plan is for people to stay . . . as we continue to fight. Because this is definitely a political decision," Alvarez said, referencing several anti-trans executive orders and attacks on diversity, equity and inclusion by the Trump administration.
>
> "But those laws are incredibly fluid. There could be court cases; we could pass something to Congress," he said. "So a lot of people are staying, just in case we're able to overturn something or the fight within KU is able to go our way."

*KU Students Protest Housing Changes They Say Will Harm Trans and Nonbinary Residents*, KCUR, https://tinyurl.com/3926nf5m (hereinafter "KCUR Article"). As the district court explained, "[t]he first amended complaint refers to the article, and the article is central to plaintiff's claims," so it is properly considered in ruling on the motion to dismiss. Aplt. App. 141 n.1 (citing *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997)).

to two specific provisions of the "Residence Life 2024-25 Undergraduate Staff Position Description"—namely, the personal-integrity provision and the Media-Referral Policy quoted above. *Id.* The letter further detailed an "Action Plan," to which Plaintiff had agreed at the March 7 meeting, which included directing all media inquiries to his direct supervisor going forward. Aplt. App. 56-57.

On March 14, 2025, Ms. Chellgren informed Plaintiff by letter that he was terminated effective that day. Aplt. App. 57. The termination letter stated that the decision was based on the conduct that had led to Plaintiff's probation—speaking to a member of the press about the department policies—and on alleged additional policy violations since the March 7 meeting. *Id.*

## II. Procedural History

Alvarez originally filed this lawsuit against KU itself, as well as against Ms. Chellgren and Ms. Waters in their official capacities, seeking prospective injunctive relief, damages, and attorneys' fees. Aplt. App. 5-14. After Defendants moved to dismiss that complaint, Plaintiff sought leave to amend, which the district court granted; the resulting amended complaint dropped all claims against KU, converted the official-capacity

6

claims against Ms. Chellgren and Ms. Waters into individual-capacity claims, dropped any request for prospective injunctive relief, and left Alvarez seeking only damages and fees. Aplt. App. 15-63.

Alvarez's First Amended Complaint asserted three claims under 42 U.S.C. § 1983 against Ms. Chellgren and Ms. Waters in their individual capacities: (i) a facial and as-applied challenge to the Media-Referral Policy; (ii) First Amendment retaliation; and (iii) denial of procedural due process under the Fourteenth Amendment. Aplt. App. 58-62.

On September 15, 2025, Ms. Chellgren and Ms. Waters each filed a separate motion to dismiss the First Amended Complaint under Rule 12(b)(6), arguing that Plaintiff failed to state a claim and that, in any event, both were entitled to qualified immunity. Aplt. App. 64-84; 90-108. In response, Alvarez abandoned Counts One and Three, conceding that he was "not contesting" Defendants' arguments on those counts. Aplt. App. 112 n.1, 119.

On March 18, 2026, the district court entered its order on Defendants' motions. Aplt. App. 139-53. The court dismissed Counts One and Three with prejudice, granted Ms. Waters' motion in full, and granted Ms. Chellgren's motion in part—sustaining dismissal of Counts

One and Three, but overruling her motion on Count Two. Aplt. App. 153.[3]

The court denied Ms. Chellgren's motion as to Count Two on both prongs of the qualified immunity analysis. First, the court concluded that the First Amended Complaint stated a claim for First Amendment retaliation, reasoning that Alvarez's speech, as alleged, was not pursuant to official duties. Aplt. App. 147-48. Specifically, the district court claimed this was so because "the policy changes which plaintiff addressed had not gone into effect at the time of his speech," that the proposed policies "were specific to Grace Pearson," and that—because Plaintiff had been reassigned to a different residence hall and ultimately turned down that position—"plaintiff was not responsible for enforcing the new policies and was never going to be responsible for doing so." *Id.*

Second, the court rejected Ms. Chellgren's argument that Alvarez failed to carry his burden to identify sufficiently specific and

---

[3] As to Ms. Waters, the court held that the First Amended Complaint's only allegations against her "d[id] not allege facts which show that she was personally involved in the continued operation of any policy or acted with any specific state of mind" and therefore failed to state a supervisory-liability claim. Aplt. App. 152. Because this appeal is an interlocutory appeal by Ms. Chellgren on the basis of qualified immunity, the district court's ruling on Ms. Waters' motion is not at issue and will not be discussed further.

particularized case law to show the constitutional right was clearly established. Aplt. App. 148-51. Specifically, the district court found it sufficient to conclude that "[e]ven before *Timmins* [*v. Plotkin*, 157 F.4th 1275 (10th Cir. 2025)], the law was clearly established that an employee does not speak pursuant to his official duties when his job duties do not require such speech (or similar activity) and his speech does not concern his duties." Aplt. App. 151.

This appeal follows.

## SUMMARY OF THE ARGUMENT

The district court erred in denying qualified immunity to Ms. Chellgren on Alvarez's First Amendment retaliation claim. The court got both prongs of the qualified-immunity analysis incorrect, and either error independently warrants reversal.

*First,* the district court erroneously concluded that Alvarez stated a First Amendment retaliation claim. Under *Garcetti*, *Lane*, *Knopf*, and *Timmins*, a public employee's speech is unprotected if it was made pursuant to his official duties—and three independent and overlapping considerations confirm that Alvarez's interview with KCUR was. Alvarez was identified in the article as a KU proctor, and the article's discussion

9

of him was inseparable from that role. He admittedly violated KU's written Media-Referral Policy—a policy that affirmatively assigned proctors the duty to refer all media inquiries to the Director of Residence Life. And he used the article to criticize, and announce his refusal to enforce, a policy of the very department that employed him. The district court reached the opposite conclusion only by ignoring the Media-Referral Policy outright and by adopting a "different dorm" rationale that is both factually and legally wrong. The new bathroom-use rule was a University-wide directive, not a Grace-Pearson-specific one. And, irrespective of that determination, it is also legally beside the point: the Media-Referral Policy is a free-standing duty that applies to every Residence Life employee in every residence hall, regardless of which substantive policies any given employee is enforcing at their specific dorm.

*Second*, the district court erroneously concluded that the alleged constitutional violation was clearly established. Alvarez did not—and cannot—identify a single decision of the Supreme Court or this Court (or any other court, for that matter) that would have placed beyond debate the unlawfulness of disciplining a public employee for a media interview

10

given in derogation of an express written media-referral policy. Faced with that absence of authority, the district court improperly defined the right at the highest level of generality and rested on broad propositions drawn from *Garcetti* and *Lane*. And the case the district court relied most upon factually, *Klaassen* (itself a district court case), points the other way: it held that a KU employee's complaints to the press about KU policy were made pursuant to his official duties, even without any media-referral policy in the picture. At best, the governing official-duties doctrine in this Circuit was unsettled at the time of the relevant conduct—a state of affairs that, by definition, cannot have placed the asserted right beyond debate in March 2025.

This Court should reverse the district court's Order in part and remand the case with instructions to dismiss the remaining claim against Ms. Chellgren based on qualified immunity.

**ARGUMENT**

## I. Standard of Review.

### A. Procedural standard.

Ms. Chellgren appeals the district court's partial denial of her motion to dismiss based on qualified immunity. Whether Alvarez has alleged a violation of his clearly established constitutional rights

11

sufficient to overcome qualified immunity "is an issue of law reviewable on interlocutory appeal." *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

This Court reviews de novo the denial of a motion to dismiss based on qualified immunity. *Id.*; *see also Eravi v. City Comm'n of Lawrence, Kan.*, 2026 WL 1412970, at *4 (10th Cir. 2026) (quoting *Irizarry v. Yehia*, 38 F.4th 1282, 1287 (10th Cir. 2022)). In evaluating this type of motion, this Court uses "the *Iqbal/Twombly* standard to determine whether Plaintiff stated a plausible constitutional violation." *Frey v. Town of Jackson, Wyo.*, 41 F.4th 1223, 1232 (10th Cir. 2022) (citing *Brown*, 662 F.3d at 1162-63). Thus, all well-pleaded factual allegations are accepted and viewed in the light most favorable to Alvarez. *Id.* He must have pleaded sufficient facts to "nudge[] [his] claims across the line from conceivable to plausible." *Brown*, 662 F.3d at 1163 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Allegations that are 'merely consistent with' a defendant's liability stop short of that line." *Frey*, 41 F.4th at 1232-33 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court "disregard[s] conclusory statements and look[s] to the

remaining factual allegations to determine whether a plaintiff stated a plausible claim." *Id.*

### B. Substantive qualified immunity standard.

"Government defendants sued under § 1983 in their individual capacities have qualified immunity: 'government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brown*, 662 F.3d at 1164. When a defendant raises qualified immunity in a motion to dismiss, she is "presumptively immune from suit," and the burden shifts to the plaintiff to overcome that presumption. *Cuervo v. Sorenson*, 112 F.4th 1307, 1314 (10th Cir. 2024).

"When a defendant raises qualified immunity in [her] motion to dismiss, we engage in a two-part analysis." *Frey*, 41 F.4th at 1232. This Court "must decide (1) whether the plaintiff plausibly alleged a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the alleged violation." *Id.* "[I]f the plaintiff fails to satisfy either prong, a court must grant qualified immunity." *Eravi*, 2026 WL 1412970, at *4 (quoting *Brown v. City of Tulsa*, 124 F.4th 1251,

13

1265 (10th Cir. 2025)). Courts "may address either prong first to achieve 'the fair and efficient disposition of each case.'" *Frey*, 41 F.4th at 1232.

The clearly-established prong, in particular, sets a "demanding standard." *Heard v. Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation marks omitted). "Constitutional rights are clearly established when Tenth Circuit or Supreme Court precedent particularized to the case at issue exists." *Eravi*, 2026 WL 1412970, at *4 (quoting *Works v. Byers*, 128 F.4th 1156, 1165-66 (10th Cir. 2025)). The precedent need not be "directly on point," but it must have "placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Accordingly, in this Circuit, "a right is clearly established when our precedent encompasses materially similar conduct or applies with ***obvious clarity*** to the conduct at issue." *Eravi*, 2026 WL 1412970, at *4 (quoting *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022)) (emphasis added).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12. Instead, "the clearly established law must be particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017); *see also District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) ("The 'clearly established' standard … requires that the legal principle clearly prohibit the officer's conduct in the *particular circumstances* before him."). Said plainly, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *White*, 580 U.S. at 79 (quotation marks omitted), and a reasonable official cannot be expected to extrapolate from generalities the unlawfulness of conduct that no prior case has held unlawful in similar circumstances.

To be sure, as the district court noted, a prior case need not be "factually identical" to make the right clearly established. Aplt. App. 149 (citing *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1215 (10th Cir. 2019)). But when reciting this principle, the district court further editorialized the standard, diluting binding precedent on particularization. Without citation to any authority for either sentence, the district court opined:

> This makes good sense: if a right is clearly established only
> when a prior case presents identical facts, qualified immunity

would apply under every different fact pattern. Under this standard, officials would always be entitled to qualified immunity so long as their actions—no matter how outrageous or harmful—were sufficiently novel.

(Aplt. App. 149.)

To begin, this is wrong on the law. The Supreme Court has already carved out an exception for the "rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Estate of Ceballos*, 919 F.3d at 1218 (quoting *Wesby*, 138 S. Ct. at 590). But that applies only in the most egregious of circumstances, circumstances that plainly aren't present here. *See, e.g., Surat v. Klamser*, 52 F.4th 1261, 1279-80 (10th Cir. 2022).

Instead, the district court used the "not factually identical" language as cover to retreat to First Amendment principles at the highest level of generality, contrary to binding precedent: the law must be "particularized" to the facts and apply with "obvious clarity" to the challenged conduct. *White*, 580 U.S. at 79; *Eravi*, 2026 WL 1412970, at *4. The district court's error wasn't just one of semantics; as discussed in Section III, *infra*, this error in perspective on the proper legal standard led directly to the improper outcome on the clearly established prong.

Under both prongs, Ms. Chellgren is entitled to qualified immunity, and this Court should reverse.

## II. Alvarez Failed To Assert A Valid Constitutional Violation.

The first prong of qualified immunity asks whether the plaintiff has "plausibly alleged a violation of a constitutional right." *Frey*, 41 F.4th at 1232. If not, the inquiry ends, and the defendant is entitled to immunity. *See id.* That is the situation here. Alvarez's claim against Ms. Chellgren rises and falls on a single proposition: that his interview with KCUR—in which he was identified as a KU proctor, discussed Housing & Residence Life policy he was paid to follow, and announced his refusal to enforce that policy—was speech protected by the First Amendment. It was not. Because Alvarez's speech to KCUR was made pursuant to his official duties, the First Amendment did not protect it, his retaliation claim is not actionable, and Ms. Chellgren is entitled to qualified immunity.

The district court reached the opposite conclusion by ignoring a critical component of Alvarez's job duties—his express and admitted obligation to refer all media inquires—and by holding that Alvarez's responsibility to enforce KU's new bathroom rule somehow evaporated because KU reassigned him to a different scholarship hall for the

17

following school year. Both moves are incorrect. The Media-Referral Policy is a duty owed by every Residence Life employee at every residence hall, and it applied to Alvarez whether he was working at Grace Pearson or anywhere else on campus. And the new bathroom rule was a University-wide directive that required *every* student, in every KU residence hall, to use facilities aligned with the gender listed in his or her KU file. (And, in any event, whether or not Alvarez would have had to enforce specific policies of his department has no impact on the requirement to refer media inquiries instead of speaking to the media about department policy.) Under any correct application of *Garcetti*, *Lane*, *Knopf*, and *Timmins*, Alvarez was speaking as a KU employee, about his employer's policies, in violation of his employer's rules—not as a private citizen on a matter of public concern.

### A. Alvarez's speech is not actionable if made pursuant to his official duties.

The parties agree that Alvarez's First Amendment retaliation claim is governed by the so-called *Garcetti/Pickering* test. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). To state such a claim, the plaintiff must plausibly plead five elements:

(1) the protected speech was not made pursuant to an employee's official duties; (2) the protected speech was on a matter of public concern; (3) the government's interests, as an employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free-speech interests; (4) the protected speech was a motivating factor in the adverse employment action; and (5) the defendant would not have made the same employment decision in the absence of the protected speech.

*Timmins v. Plotkin*, 157 F.4th 1275, 1277 (10th Cir. 2025); *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018). The first three elements are questions of law for the Court. *Knopf*, 884 F.3d at 945. And the plaintiff "must establish all five elements" to prevail; the failure of any one is fatal. *Id.*

At this stage, this case—and this appeal—turns on the first element. If Alvarez's speech to KCUR was made pursuant to his official duties as a KU proctor, the First Amendment did not protect it, the inquiry ends, and Alvarez has failed to allege any actionable retaliation. *Lane*, 573 U.S. at 237 ("[I]f the speech is made pursuant to the employee's ordinary job duties, then the employee is not speaking as a citizen for First Amendment purposes, and the inquiry ends.").

The Supreme Court has "clarified that '[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope

of an employee's duties, not whether it merely concerns those duties.'" *Timmins*, 157 F.4th at 1278 (quoting *Lane*, 573 U.S. at 240). The inquiry "is a practical one," *Garcetti*, 547 U.S. at 424, and there "are no bright line rules," *Knopf*, 884 F.3d at 945. "Many facts may be relevant—the tasks in an employee's job description, the frequency with which an employee performs a task, the subject matter of the employee's speech, the recipient of the employee's speech, the legal obligation for the employee to speak—but no one fact is determinative." *Id.* Courts are to "take a practical view of all the facts and circumstances surrounding the speech and the employment relationship," *Knopf*, 884 F.3d at 946 (citation omitted), and to ask whether the speech "stemmed from and were the type of activities that [the employee] was paid to do," *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121, 1139 (10th Cir. 2024) (citation omitted).

Two features of that test are particularly important here. *First*, the official-duties inquiry is not limited to tasks expressly listed in a written job description; it extends to speech that is part of the broader job the employee was hired to do. The Supreme Court rejected the "suggestion that employers can restrict employees' rights by creating excessively

broad job descriptions," but it equally cautioned that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424-25. What matters is whether the speech "stemmed from" and is "the type of activit[y]" the employee "was paid to do." *Tufaro*, 107 F.4th at 1139 (citation and brackets omitted); *accord Timmins*, 157 F.4th at 1280.

*Second*, the inquiry expressly considers "the recipient of the employee's speech" and "the legal obligation for the employee to speak." *Knopf*, 884 F.3d at 945; *Timmins*, 157 F.4th at 1280. Speech directed at an audience the employee is legally *required* to address in a particular way—or required *not* to address at all—is by definition speech that goes to the heart of the employee's official function. *See Hurst v. Lee Cnty., Miss.*, 764 F.3d 480, 482-83 (5th Cir. 2014) (press inquiries within official duties of correctional officer when policy authorized disclosure of only certain limited information, and required no further speech absent authorization from superior officers); *Samuelson v. LaPorte Cmty. School Corp.*, 526 F.3d 1046, 1052 (7th Cir. 2008) (policy requiring staff to refer matters "requiring administrative attention" to supervisors does not restrict protected speech because it addresses only "speech grounded in

21

the public employee's professional duties").[4] As the Supreme Court explained, "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission," and "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421–23.

This Court's recent decision in *Timmins* does not displace any of that framework; it reaffirms it. *Timmins* recited the same multi-factor list articulated in *Knopf*, including audience, subject matter, frequency of task, job description, and legal obligation to speak. 157 F.4th at 1280. It expressly held that "an employee's statements are made pursuant to official duties when they stemmed from and were the type of activities that [she] was paid to do." *Id.* (citation and brackets omitted). And while *Timmins* disapproved the broadest language in older Tenth Circuit cases—e.g., that speech is unprotected simply because it "relates to" or "owes its existence to" the job—it did so to align the Circuit with *Lane*'s "ordinarily within the scope" articulation, not to scrap the practical, fact-

---

[4] These cases are discussed in further detail in Section II.C.1., *infra.*

specific inquiry that has long governed. *Id.* Indeed, *Timmins* reversed in favor of the plaintiff because nothing in the complaint suggested that a general counsel had a duty to "go[] outside the chain of command" or "publicly criticize the Board for rejecting her advice." *Id.* at 1280-81. As shown below, Alvarez's case is on the other side of that line: his job duties affirmatively required him to refer media inquiries about his employer's policies to his supervisor, not to provide quotes to KCUR.

### B. Alvarez's speech to KCUR was made pursuant to his official duties as a proctor.

Applying the multi-factor framework to the well-pleaded allegations of the First Amended Complaint and the documents it incorporates, three independent and overlapping considerations confirm that Alvarez's speech to KCUR was made pursuant to his official duties: (i) Alvarez was identified as a KU proctor in the article, and the article's discussion of him was inseparable from that role; (ii) Alvarez's speech to KCUR violated his express, written duty to refer all media inquiries to a supervisor under KU's Media-Referral Policy; and (iii) Alvarez's speech criticized—and announced his refusal to enforce—a policy of the very department that employed him. Any one of these would be sufficient to render the speech unprotected; together they are dispositive.

**1. KCUR identified Alvarez as a proctor, and the article's discussion of him was inseparable from that role.**

The First Amended Complaint concedes that the KCUR article "detail[ed]" that Alvarez "worked as a Proctor at Grace Pearson during his time living there." Aplt. App. 56. The article itself went further. It identified Alvarez by name and position as a Residence Life employee; it explained that a proctor's duties are "similar to a resident assistant"; it reported that he had applied to serve as a proctor in Grace Pearson again for the 2025-26 academic year; it reported that his "bosses" had told him they "weren't confident" that he "would implement the policies that they were going to change at GP"; and it reported that he was "turning down the offer to work at another residence hall." Aplt. App. 141-42; *see also* Aplt. App. 69-70. Far from being a "brief" or incidental mention, Alvarez's role as a proctor framed nearly every paragraph that discussed him: his views about the new policies, his future employment at KU Housing, his interactions with his supervisors, and his decision to leave KU housing.

That context matters under the *Garcetti/Pickering* framework. "[T]he employee's chosen audience" and "the subject matter of the employee's speech" are both relevant factors. *Knopf*, 884 F.3d at 945;

24

*Timmins*, 157 F.4th at 1280. Alvarez did not write a letter to the editor about a matter beyond his employer's purview, as the teacher did in *Pickering*, 391 U.S. at 566. He gave an on-the-record interview to a news organization about his employer's housing policies, his supervisors' employment decisions about him, and his own willingness (or unwillingness) to enforce his employer's rules. By the article's own framing, the credibility and newsworthiness of Alvarez's comments turned in significant part on his status as a KU Housing employee. A reasonable reader had every reason to understand Alvarez's comments as the views of a KU insider speaking from his vantage as a proctor. He spoke, in short, "in his . . . professional capacity." *Garcetti*, 547 U.S. at 422.

> **2.  The Media-Referral Policy made handling media inquiries part of Alvarez's official duties, and he admittedly violated it.**

The single most important factor under the multi-factor test—and the one the district court overlooked—is that KU had an express written policy that made interactions with the media part of Alvarez's official duties as a proctor. The Residence Life 2024–25 Emergency Procedures Manual requires employees to:

> Refer a student's parents, relatives, friends, and/or the media (press) to your supervisor. Unless otherwise designated, the Director of Residence Life in conjunction with KU Strategic Communications & Public Affairs will respond to all media inquiries.

Aplt. App. 87-88; *see also* Aplt. App. 56 (acknowledging the same provision).[5]

Two consequences follow. *First*, under the *Garcetti/Pickering* framework, handling media inquiries by referring them to public affairs was "itself ordinarily within the scope" of Alvarez's duties as a proctor. *Lane*, 573 U.S. at 240. The Media-Referral Policy did not merely prohibit certain speech; it affirmatively assigned proctors a function to perform whenever a media inquiry arose—namely, to refer the inquiry up the chain. That assignment of responsibility brings media interactions squarely within "the type of activit[ies]" Alvarez "was paid to do." *Tufaro*, 107 F.4th at 1139 (citation and brackets omitted). It is also exactly the kind of express duty that the Tenth Circuit has identified as a factor

---

[5] The Residence Life 2024-25 Undergraduate Staff Position Description likewise requires every staff member to "demonstrate a commitment to personal integrity, such as modeling good judgment, ethical behavior, and adherence to laws and policies." Aplt. App. 87. The First Amended Complaint pleads these provisions directly into the case. *See* Aplt. App. 56.

weighing toward official-duty speech: a documented "task[] in [the] employee's job description" and a "legal obligation for the employee to speak" (or, here, to refer rather than to speak). *Knopf*, 884 F.3d at 945; *Timmins*, 157 F.4th at 1280.

*Second*, Alvarez admitted that he understood the Media-Referral Policy to apply to his interview with KCUR—and that he spoke anyway. As recounted in the March 13 probation letter (incorporated through Aplt. App. 56-57, ¶¶ 17–22), Alvarez told Ms. Chellgren and Complex Director Rebekah Love that he had "talked with the reporter from KCUR about [his] position as an undergraduate staff member working in Grace Pearson Hall despite knowing that [his] job expectations prohibited [him] from doing so." Aplt. App. 87. That admission cannot be reconciled with the position that Alvarez was speaking as a private citizen outside the scope of his employment. An employee who knowingly violates a job rule that governs how he is to handle a particular category of communications is, by his own account, speaking in derogation of his duties—not divorced from them. Once again, this is the very essence of "speech [made] pursuant to [an employee's] official duties." *Garcetti*, 547 U.S. at 421.

27

### 3. Alvarez's speech criticized, and announced his refusal to enforce, a policy of the department that employed him.

The third feature of Alvarez's speech that places it within his official duties is the substantive content of what he said. The article was not about state legislation in the abstract or a hypothetical employer; it was about *KU Housing & Residence Life's* implementation of new bathroom-use rules in his own scholarship hall. And the article reported—in Alvarez's own words and through his supervisors' description of him—that he would not implement those policies. The relevant excerpts speak for themselves: "They told me that they weren't confident that I would implement the policies that they were going to change at GP"; "[a] more personal meeting I had with someone higher in housing[, they] told me . . . they were worried I was going to be frustrated and because they were changing the policies"; "Currently, the plan is for people to stay . . . as *we* continue to fight." Aplt. App. 142 (emphasis added).

This kind of speech falls within an employee's official duties. In *Klaassen v. Atkinson* (a case before this same district court), a former KU professor's complaints to the *Lawrence Journal-World* about governance

and spending decisions at the KU Medical Center were held to be pursuant to his official duties because his "speech was related to alleged wrongdoing directly impacting his ability to carry out his official duties." 348 F. Supp. 3d at 1170. The *Klaassen* court reached that conclusion even though the summary judgment record "doesn't establish as an uncontroverted fact that talking to the news media was one of [the professor's] official job duties," *id.*, because his speech was nonetheless directly tied to the duties he was paid to perform. So too here: Alvarez's speech was "directly impact[ing] his ability to carry out his official duties" as a proctor, *id.*, both because his job required him to follow and model adherence to Residence Life policies, (*see* Aplt. App. 56, 85) and because the policy he criticized was a policy his job required him to enforce.

Additionally, *Casey v. West Las Vegas Independent School District*, confirms that going outside the chain of command does not transform official-duty speech into citizen speech when the topic falls within the employee's assigned portfolio. There, the Tenth Circuit (per then-Judge Gorsuch) held that a school superintendent's report of Head Start improprieties to federal authorities was made "pursuant to her official duties" even though she "did not advise her employers but instead went

very much around them," because the regulatory subject matter fell within her assigned responsibility for the program. 473 F.3d 1323, 1329-31 (10th Cir. 2007). The same logic applies here: Alvarez went straight to KCUR about a subject (KU Housing policy and his own role as proctor) squarely within his employment portfolio.

*Garcetti* itself underscores the institutional concern at work. "Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." 547 U.S. at 422-23. KU's interest in speaking with one voice through its Director of Residence Life and Strategic Communications office about its own housing policies, in its own residence halls, on the eve of implementing new bathroom rules, is precisely that interest. The Media-Referral Policy exists to effectuate it, and Alvarez's public refusal to abide by housing policy he was paid to enforce undermines it.

**C. The district court's contrary analysis cannot withstand scrutiny.**

The district court found that Alvarez had stated a First Amendment retaliation claim because, in its view, the First Amended Complaint did not allege that Alvarez's "job duties as a proctor involved speaking to the press about Grace Pearson policies," and the new bathroom policy "had not gone into effect at the time of his speech" and would only have applied at a residence hall where KU "had no plans to employ" him the following year. Aplt. App. 146-47. Both rationales miss the mark. The first ignores the Media-Referral Policy. The second misstates both what the new bathroom policy required and what the Media-Referral Policy itself demands.

**1. The district court erred in disregarding the Media-Referral Policy and Alvarez's written job duties.**

The district court declined to consider the March 13 and March 14 letters—the very documents that memorialize Alvarez's relevant job duties and the Media-Referral Policy—on the theory that they "are not . . . 'central' to plaintiff's claim," and that their description of his duties "appear[s] to be hearsay." Aplt. App. 146-47 n.4. That is doubly mistaken. The First Amended Complaint repeatedly pleads, quotes, and relies on

31

the very provisions in those letters that establish Alvarez's job duties—including the integrity provision and the Media-Referral Policy themselves. *See* Aplt. App. 56. "[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true," and a document is properly considered when, as here, it is "central to plaintiff's claim and . . . referred to in the complaint." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023); *see also GFF Corp.*, 130 F.3d at 1384. Alvarez "introduced" his job description and the Media-Referral Policy "by naming, citing, and discussing" them in his complaint, and the Court is permitted—indeed required—to consider them as written. *Cf. Tufaro*, 107 F.4th at 1132 (rejecting plaintiff's selective quotation of incorporated handbook).

The court's "hearsay" objection is likewise misplaced. The letters are not being offered for the truth of any disputed fact; they are being read for the operative job-duty provisions they describe, which the First Amended Complaint itself quotes and relies upon. *See* Aplt. App. 56. The relevant inquiry under *Garcetti/Pickering*—whether Alvarez's job included a duty to refer media inquiries—is a question of law for the Court, and the Court is entitled to look to the very documents the plaintiff

incorporated to answer it. Once those provisions are read, the question is no longer close: the Media-Referral Policy was part of Alvarez's official duties, and his speech to KCUR violated it.

Even setting these letters and hearsay issues aside, the district court's analysis of the duties as admitted by Alvarez illustrates how badly the ruling missed the mark:

> Here, the first amended complaint does not allege that plaintiff's job duties as a proctor involved speaking to the press about Grace Pearson policies, or that KU paid him to do similar tasks. In fact, the first amended complaint alleges that KU policy prohibits proctors from speaking to the press.

Aplt. App. 146-47 (footnote omitted).

***Precisely.*** The Amended Complaint admits that how Alvarez interacted with the media on issues about the department was a core job function—he was directed not to do it, and to refer all inquires to his superiors. That he was directed *not* to speak to the media, as opposed to being directed *to* speak to the media, has no legal effect whatsoever. The affirmative job duty was what it was (and what Alvarez admitted to), and he violated it.

Indeed, the district court's analysis appears to rest on the unstated premise that *Garcetti* does not permit a policy that issues a negative

33

command—i.e., a directive telling an employee who he *cannot* speak to—as opposed to an affirmative instruction to speak. But the district court never actually analyzed that issue; it simply observed that the First Amended Complaint did not allege that Alvarez's "job duties as a proctor involved *speaking* to the press about Grace Pearson policies," and then treated the Media-Referral Policy's negative command (upon receipt of media inquiries, do *not* speak to the media; *refer* inquiries to your supervisor) as if it were somehow outside the scope of *Garcetti*. Aplt. App. 146-47. The district court cited no case—from the Tenth Circuit, the Supreme Court, or any other court—holding that a policy directing an employee *not* to speak to the media falls outside the *Garcetti* framework. Moreover, contrary to the district court's apparent assumption, courts that have analyzed similar policies hold that an employee who violates them is speaking pursuant to his official duties and is not speaking as a citizen.

In *Hurst v. Lee County, Mississippi*, 764 F.3d 480 (5th Cir. 2014), a corrections officer was terminated for providing information to a newspaper reporter in violation of the sheriff's department's media-relations policy—a policy that authorized employees to provide media

only certain limited information, and required them to not speak any further before obtaining authorization from their superiors. *Id.* at 482-83. The Fifth Circuit held that the officer's statements to the media were "ordinarily within the scope of [his] duties" under *Garcetti* and *Lane*, and that he therefore "was not speaking as a citizen for First Amendment purposes." *Id.* at 485. The court reached that conclusion even though the officer's speech concerned an event that occurred while he was off duty the night before, because the media-relations policy itself placed the handling of press inquiries within his official responsibilities. *Id.* at 484-85 & n.2.

Similarly, in *Samuelson v. LaPorte Community School Corp.*, 526 F.3d 1046 (7th Cir. 2008), the court held that a school corporation's chain-of-command policy requiring staff to refer matters "requiring administrative attention" to their supervisors "does not restrict any speech protected by the First Amendment" because it addresses only "speech grounded in the public employee's professional duties." *Id.* at 1052. The *Samuelson* court explained that such a policy "merely establish[es] a chain of command in order to maintain efficient resolution of issues that an employee's duties require him to address in the course

of his employment," and that restricting such expression does not implicate the First Amendment at all. *Id.*

Both *Hurst* and *Samuelson* confirm the straightforward proposition that the district court here failed to engage with: when an employer directs its employees *not* to speak to outside parties about matters within their employment portfolio—and to route those communications through designated channels instead—the employee who violates that directive is speaking pursuant to his official duties, not as a private citizen. The direction not to speak is itself an official duty, and violation of it is official-duty speech subject to employer discipline under *Garcetti*. The district court did not even engage with this issue, much less identify case law supporting its apparent view on this point.

### 2. The court's "different dorm" rationale is both factually wrong and legally beside the point.

The remainder of the district court's official-duties analysis rests almost entirely on the proposition that Alvarez "had no job duty to enforce the new policies" because the new bathroom rules "were effective the following school year (2025-26), and KU apparently had no plans to employ [Alvarez] at Grace Pearson during that school year." Aplt. App. 147. That theory is wrong twice over—both factually and legally.

36

*Factually*, the new bathroom rule was not Grace-Pearson-specific. The First Amended Complaint itself alleges that the policy would "require students to use the bathroom that aligns with the gender listed in their KU student file." Aplt. App. 55. That is a University-wide directive, applicable to every KU residence hall and every KU residence-life employee tasked with enforcing housing policies. The First Amended Complaint does not allege—because it could not—that KU's policy of requiring students to use the bathroom corresponding to the gender in their KU file would apply only at Grace Pearson.

The KCUR article on which the district court relied confirms as much. Contrary to the district court's view that, "according to the article, the proposed policies were specific to Grace Pearson," Aplt. App. 147, the article actually describes *two* distinct KU actions side-by-side—one specific to Grace Pearson and one not. As the article explains, KU's housing authority emailed Grace Pearson residents to tell them that "the dorm would eliminate the gender-neutral bathroom along with gender-inclusive room assignments *there, and KU also would enforce rules requiring people to use the bathroom that aligns with the gender that's listed in their student file.*" Aplt. App. 142 (emphases added); KCUR

37

Article. The first clause—with its "there" tied to Grace Pearson—describes the Grace-Pearson-specific reconfiguration. The second clause has no such limitation: *KU* would enforce rules requiring *people* (not just residents of Grace Pearson) to use the bathroom matching their student-file gender. Nothing in the article suggests this rule was confined to one hall, and the article's grammar affirmatively suggests the opposite.

The remainder of the article reinforces that reading. KU itself told KCUR that the bathroom change "was made to comply with [the] building code[]," specifically the International Building Code, which provides that "[w]here plumbing fixtures are required, separate facilities shall be provided for each sex." *Id.* A building-code rationale necessarily applies to every communal bathroom on campus, not just to Grace Pearson's. The article also describes KU's alternative housing offerings to displaced Grace Pearson residents: students could remain at Grace Pearson on a male- or female-designated floor or could apply for a gender-inclusive room at K.K. Amini Hall, with KU stating that "[i]f requests for [gender-inclusive assignments] exceed the available designated space in KK Amini Hall, residents will be offered options in other housing spaces." *Id.* Those alternatives only make sense if the underlying bathroom-use rule

operates across residence halls. And K.K. Amini Hall is, of course, exactly the residence hall where KU had offered Alvarez a proctor position for 2025-26. *See* Aplt. App. 85, 142. Whether one looks to the policy change responding to "recent state and federal legislation," Aplt. App. 55, the broader text of the article, or the building-code rationale KU itself articulated, the conclusion is the same: the new bathroom-use rule would have governed Alvarez's enforcement obligations wherever he worked at KU. The district court's premise that Alvarez "was never going to be responsible" for enforcing the policy thus mistook the scope of the policy itself.

*Legally*, the district court's reasoning is a red herring. Whether or not Alvarez was going to be responsible for enforcing any specific policy of the department in his specific role has nothing whatsoever to do with his obligations under the Media-Referral Policy—the duty Alvarez actually violated. The Media-Referral Policy is an independent, free-standing duty that applies to *every* residence-life employee in *every* residence hall, regardless of which specific substantive policies that employee is responsible for enforcing. Consider the natural test case: a proctor working in a residence hall whose physical configuration required

no change at all under the new bathroom rule. That proctor would still be barred by the Media-Referral Policy from giving on-the-record press interviews about KU Housing's policies; the proctor's duty to refer media inquiries to the Director of Residence Life would attach regardless of whether the proctor had any personal role in enforcing the bathroom rule. The proctor's enforcement portfolio is therefore irrelevant to the official-duties question with respect to the Media-Referral Policy. Yet that is exactly the (mistaken) link the district court drew—collapsing the question whether Alvarez owed a duty to refer media inquiries into the question whether he would personally enforce a bathroom rule in the future.

The district court's analysis thus addresses, at most, one of the three independent grounds on which Alvarez's speech is unprotected. It says nothing about (i) Alvarez's role as a KU proctor as portrayed in the KCUR article; (ii) the Media-Referral Policy and Alvarez's admitted, knowing violation of it; or (iii) the practical reality that Alvarez was speaking publicly about his own department's policies in his own residence hall. Even if one were to credit the court's premise that Alvarez would not have personally enforced the new bathroom rule, the order

leaves untouched the two most important factors illustrating that Alvarez spoke pursuant to his official duties.

*     *     *

At bottom, Alvarez was a KU Housing employee who, in violation of his department's express media policy and in derogation of his duty to model adherence to his employer's rules, gave an on-the-record interview to a news outlet about his own department's policies in his own residence hall, identified himself in the article in his role as a proctor, and publicly indicated that he would not implement the policies his job required him to enforce—and did not refer the inquiry to public affairs as required by policy. Under *Garcetti*, *Lane*, *Knopf*, *Timmins*, and *Tufaro*, that is speech made pursuant to official duties and unprotected by the First Amendment. The district court's contrary conclusion rests on a too-narrow reading of Alvarez's job and an erroneous view that the Media-Referral Policy was somehow tied to the substantive bathroom rule. Reversal is required, and Count Two should be dismissed for failure to state a claim and on qualified-immunity grounds.

## III. Alvarez Failed To Meet His Burden To Proffer A Clearly Established Constitutional Violation.

Even if this Court were to conclude that Alvarez pleaded an adequate constitutional violation, Ms. Chellgren is independently entitled to qualified immunity because the right Alvarez asserts was not clearly established at the time of the conduct at issue. The two prongs of the qualified-immunity analysis are independent; either is dispositive, and this Court "may address either prong first to achieve the fair and efficient disposition of each case." *Frey*, 41 F.4th at 1232 (cleaned up). Here, this Court may wish to exercise that discretion, because Alvarez cannot identify a single decision of the Supreme Court or this Court (or any other court, for that matter) that would put a reasonable official on notice that disciplining a public employee for publicly criticizing his employer's policies in violation of a media-referral policy, while identifying himself in his employee role, was forbidden by the First Amendment.

The district court didn't cite any such case either. And its contrary conclusion rests on a series of compounding errors: it generalized the right to the highest level of First Amendment abstraction; it doubled down on the same flawed "different dorm" reasoning; and it grounded its analysis in case law that, on the district court's own telling, did not

crystalize until *after* the events in this case. Each of these errors is independently fatal to Alvarez's burden, and together they confirm that this is a paradigmatic qualified-immunity case.

### A. No Supreme Court or Tenth Circuit precedent put Ms. Chellgren on notice that discipline for violation of the Media-Referral Policy violated the First Amendment.

The clearly-established standard is exacting. "Constitutional rights are clearly established when Tenth Circuit or Supreme Court precedent *particularized to the case at issue* exists." *Eravi*, 2026 WL 1412970, at \*4 (quoting *Works v. Byers*, 128 F.4th 1156, 1165-66 (10th Cir. 2025)) (emphasis added). As discussed in Section I, *supra*, although an identical case is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (cleaned up). In this Circuit, "a right is clearly established when our precedent encompasses materially similar conduct or applies with *obvious clarity* to the conduct at issue." *Eravi*, 2026 WL 1412970, at \*4 (quoting *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022)) (emphasis added).

Alvarez cannot meet that standard. As Ms. Chellgren explained below, there is no Supreme Court, Tenth Circuit, or persuasive body of

case law holding—or even suggesting—that a public employer violates the First Amendment by disciplining an employee for a media interview given in derogation of a written media-referral policy that the employee admittedly understood to apply to him. There is no such case for a residence-life proctor. There is no such case for any analogous front-line public employee. There is, in short, no case at all. And without a case, Alvarez cannot show that "every reasonable official would have understood that what [she was] doing violate[d]" his First Amendment rights. *Mullenix*, 577 U.S. at 11 (cleaned up).

To be clear, Ms. Chellgren does not contend that Alvarez must produce a hyper-factualized, identical-twin case. But there is one critical fact that pervades this entire dispute and that any clearly-established showing must engage with: the existence of the Media-Referral Policy and Alvarez's admitted, knowing violation of it. *See supra* § II.B.2; Aplt. App. 56. That fact is not a minor variable on the margins of the case; it is the operative job duty. And it is dispositive on the official-duties prong of the *Garcetti*/*Pickering* analysis, because the inquiry expressly turns on "the recipient of the employee's speech" and "the legal obligation for the employee to speak." *Knopf*, 884 F.3d at 945; *Timmins*, 157 F.4th at 1280.

For Alvarez to carry his clearly-established burden, he must therefore identify a case with at least that fact—or with one materially similar to it—on the other side of the line. He has none.

Two further considerations confirm the point. First, this Circuit's clearly-established analysis is element-specific: a precedent on one element of the *Garcetti/Pickering* test cannot do double duty as clearly established law on a different element. *See Knopf*, 884 F.3d at 948 ("a precedent can't clearly establish the law on a separate element of the *Garcetti/Pickering* test"). The first element is where this case lives, and the absence of any controlling decision tying a media-referral policy (or anything like one) to that element is fatal.

Second, the case that the district court discusses (albeit a district court case in its own right, not one from the Supreme Court or this Court) cuts in Ms. Chellgren's favor, not Alvarez's. In *Klaassen v. Atkinson*, the court held that a tenured KU Medical Center professor's complaints to the Lawrence Journal-World about governance and spending decisions were made "pursuant to his official duties" because his "speech was related to alleged wrongdoing directly impacting his ability to carry out his official duties." 348 F. Supp. 3d at 1170. In other words, when a public

45

employee criticized his department through the press about a matter within his job portfolio (notably even absent any media-referral policy), the First Amendment did not protect the speech. At a minimum, the existence of authority pointing the other way means that the supposed unlawfulness of Ms. Chellgren's conduct was not "beyond debate." *Mullenix*, 577 U.S. at 12; *see Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy."). That is the textbook fact pattern in which qualified immunity is meant to apply, not to be withheld. *See White*, 580 U.S. at 79 (qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law" (cleaned up)).

**B.** **The district court defined the right at the highest level of generality and grounded its analysis in the same flawed "different dorm" reasoning.**

The district court's disposition of the clearly-established prong consists, in the one operative paragraph, of a single sentence: "Even before *Timmins*, the law was clearly established that an employee does not speak pursuant to his official duties when his job duties do not require such speech (or similar activity) and his speech does not concern

46

his duties." Aplt. App. 151. That formulation is the very definition of "clearly established law at a high level of generality," *Mullenix*, 577 U.S. at 12, directly at odds with binding Supreme Court and Tenth Circuit authority.

### 1. The district court generalized away the particularization requirement.

*Wieber v. Porter*, 2025 WL 635753 (10th Cir. 2025), is instructive. There, the plaintiff invoked broad First Amendment principles drawn from *Watts v. United States*, 394 U.S. 705 (1969), to argue that an officer's warrantless arrest for witness retaliation was clearly unlawful. This Court rejected that approach in plain terms: "we cannot see how Mr. Wieber's recitation of *highly generalized* First Amendment principles from *Watts* suffices to establish that all but the most incompetent officers would have known that they were violating the Fourth Amendment . . . in these circumstances." *Wieber*, 2025 WL 635753, at \*7 (emphasis added). This Court reaffirmed that "the clarity of the law must be viewed in light of the specific context of the case, not as a broad general proposition." *Id.* (cleaned up). Because the plaintiff "did not cite a single case that relates to the question . . . under any facts—much less

sufficiently analogous facts," his clearly-established showing failed at the threshold. *Id.*

The district court here committed exactly the error this Court warned against in *Wieber*. Reframed at the level of abstraction the district court adopted, the "right" at issue is the right of a public employee not to be disciplined for speech that is not "pursuant to" his official duties—nothing more particular than that. But that is just a paraphrase of the first element of the *Garcetti/Pickering* test itself. It is no more particularized than "the First Amendment protects free speech" or "the Fourth Amendment forbids unreasonable searches." The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality," *Mullenix*, 577 U.S. at 12 (cleaned up); *see also White*, 580 U.S. at 79; *Wesby*, 583 U.S. at 63-64 (2018), and this Circuit polices that rule rigorously. *See Wieber*, 2025 WL 635753, at *7; *Avant v. Doke*, 104 F.4th 203, 209–11 (10th Cir. 2024) (granting qualified immunity where existing precedent did not particularize a public-concern analysis to the type of speech at issue).

Particularization matters here for a concrete reason: the controlling fact in this case—the Media-Referral Policy and Alvarez's admitted,

knowing violation of it—is wholly absent from the case law the district court invoked.  None of the decisions the district court cited involves a written employer policy assigning the employee a duty regarding media interactions; none involves an employee who acknowledged in advance that the policy applied to him; and none involves an employee who simultaneously identified himself in his employee role to the news outlet. Without authority addressing those features—at the very least, one involving a media-referral policy in some way—the law was not "sufficiently clear that every reasonable official would have understood" that Ms. Chellgren's conduct was unlawful.  *Mullenix*, 577 U.S. at 11 (cleaned up).

The absence of authority is particularly acute on the specific legal question the district court's analysis implicated but never actually resolved: whether *Garcetti* permits an employer to issue a negative-command policy—one that directs employees *not* to speak to outside parties and to route communications through designated channels—as opposed to an affirmative instruction *to* speak.  The district court appeared to assume the answer was no, observing that the First Amended Complaint did not allege that Alvarez's "job duties as a proctor

involved *speaking* to the press." Aplt. App. 146-47. But neither the district court nor Alvarez identified a single case—from any court—holding that a media-referral policy framed as a negative command falls outside the *Garcetti* framework. It was Alvarez's burden on this prong to come forward with authority placing the unlawfulness of Ms. Chellgren's conduct "beyond debate," *Mullenix*, 577 U.S. at 12, and the complete absence of any authority supporting his implicit theory that a negative-command policy is constitutionally impermissible is itself dispositive. A reasonable official in Ms. Chellgren's position cannot be expected to have intuited an unarticulated constitutional rule that no court has announced.

Indeed, far from supporting Alvarez's position, the persuasive authority that does exist runs decidedly against him. As discussed in Section II.C.1, *supra, Hurst* and *Samuelson* both addressed policies materially similar to the Media-Referral Policy—policies framed as negative commands directing employees *not* to speak externally and to route communications through designated supervisory channels. In *Hurst*, the Fifth Circuit held that an officer who violated his department's media-relations policy was speaking "ordinarily within the scope of [his]

50

duties" and therefore "was not speaking as a citizen for First Amendment purposes." 764 F.3d at 485. And in *Samuelson*, the Seventh Circuit held that a school corporation's chain-of-command policy was constitutional because it restricted only "speech grounded in the public employee's professional duties" and therefore "does not restrict any speech protected by the First Amendment." 526 F.3d at 1052. Both cases endorse the constitutionality of the very type of negative-command policy at issue here.

To be clear, Ms. Chellgren need not come forward with such cases to prevail—qualified immunity places the burden on Alvarez, not on the defendant—but the fact that the courts to have analyzed the question reached the opposite conclusion from the one the district court assumed only underscores how far Alvarez is from carrying his burden. The Tenth Circuit has simply never decided whether a negative-command media policy is permissible under *Garcetti*, and qualified immunity exists to shield officials when the law has not provided concrete guidance on the question their conduct implicates. *See Mullenix*, 577 U.S. at 12 ("existing precedent must have placed the statutory or constitutional question beyond debate" (cleaned up)); *Wilson*, 526 U.S. at 618 ("If judges thus

51

disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy.").

### 2. The district court's "different dorm" reasoning is doubly defective on this prong of the qualified immunity analysis.

Section II.C.2, *supra*, explains why the district court's "different dorm" rationale is wrong on the merits: the new bathroom-use rule was a University-wide directive, not a Grace-Pearson-specific one; the Media-Referral Policy is an independent and free-standing duty that has nothing to do with what substantive policies a particular proctor enforces in a particular building; and the official-duties inquiry under *Knopf* and *Timmins* turns on what the employee was paid to do, not on a counterfactual about future assignments. Ms. Chellgren incorporates that critique by reference and does not repeat it here.

What bears emphasis on this prong is that the district court's reasoning is even more problematic here than it was on the merits. On the clearly-established prong, the court did not cite a single case for the proposition that a proctor's enforcement portfolio in a specific residence hall determines whether his media interview about University-wide policy is "pursuant to" his official duties. Nor could it have; no such case

exists. An entirely novel legal theory cannot, by definition, be clearly established. *See Cummings v. Dean*, 913 F.3d 1227, 1243 (10th Cir. 2019) (clearly-established showing failed where plaintiffs could not "identif[y] any case from the Supreme Court or this court finding a defendant liable under federal law in factually similar circumstances"). At the very least, the absence of any guidance on the bounds of how a media-referral policy applies to public employees—much less guidance tying the application to whether the employee personally enforces the substantive policy he is speaking about—forecloses Alvarez's clearly-established showing. This is precisely the type of factual scenario for which qualified immunity exists: to "give[] government officials breathing room to make reasonable but mistaken judgments" when the law provides no concrete guidance. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up).

C. ***Timmins* illustrates that the law was changing in the run-up to Ms. Chellgren's conduct, and the pre-*Timmins* authority the district court actually relies upon speaks only at the highest level of generality.**

The district court did not, strictly speaking, rest its clearly-established holding on *Timmins*. In fact, the court purported to frame its conclusion as one that obtained "[e]ven before *Timmins*." Aplt. App. 151. But *the way* the district court got there only underscores why qualified

immunity is required.  In *the very same paragraphs*, the district court acknowledged that, before November 2025, this Circuit had "taken a broad view of the meaning of speech that is pursuant to an employee's official duties," and that *Timmins* was needed to "reject[] overly-broad interpretations of *Garcetti* by clarifying and applying principles which the Supreme Court established in *Lane*."  Aplt. App. 150 (citing *Knopf*, 884 F.3d at 945; *Chavez-Rodriguez*, 596 F.3d at 713; *Brammer-Hoelter*, 492 F.3d at 1203).  That concession is fatal.  Either *Timmins narrowed* pre-existing Tenth Circuit doctrine—in which case the law was unsettled enough to require correction, and a reasonable official in March 2025 was not on notice of the narrower rule—or the pre-*Timmins* authority the district court invokes is so general that it cannot satisfy the particularization requirement.  Either way, Alvarez's argument fails and qualified immunity must apply.

> **1.** **_Timmins_ illustrates that this Circuit's official-duties doctrine was still in motion in late 2025, which forecloses any clearly-established showing for conduct in March 2025.**

It has been black-letter law for decades that the clearly-established prong looks only to authority predating the challenged conduct.  *See A.M. v. Holmes*, 830 F.3d 1123, 1154-55 (10th Cir. 2016) (whether a violation

was clearly established depends on "surveying the caselaw extant at the time" of the events); *McCoy v. Meyers*, 887 F.3d 1034, 1048-49 (10th Cir. 2018) (the inquiry turns on "preexisting precedent"); *Wilson*, 526 U.S. at 617 (state officials cannot be "expected to predict the future course of constitutional law").  And it is equally well settled that "[i]f judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy."  *Wilson*, 526 U.S. at 618.  *Timmins* is decisive evidence that this Circuit's judges had not, by March 2025, settled the official-duties question on anything approaching the level of particularization required to defeat qualified immunity.

Decided eight months after Ms. Chellgren's actions, *Timmins* did not merely apply the existing doctrine—it openly realigned it.  This Court explained that certain "language in our pre-*Lane* cases contradicts *Lane* and is no longer good law," and proceeded to disapprove two of this Circuit's own published decisions:  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007), and *Sarkar v. McCallin*, 636 F.3d 572, 575 (10th Cir. 2011).  *See Timmins*, 157 F.4th at 1281. When a Circuit must, in late 2025, formally repudiate two of its

own published decisions to bring its law into alignment with *Lane*, it is not possible for that same body of law to have placed the official-duties question "beyond debate" for a lay employee in early 2025. *Mullenix*, 577 U.S. at 12; *see also Reichle v. Howards*, 566 U.S. 658, 669-70 (2012) ("This Court's precedents do not satisfy the 'demanding standard' . . . because they offered divergent views."); *Wilson*, 526 U.S. at 618.  That is the very picture of legal flux—and legal flux is the paradigmatic case for qualified immunity.

> **2. To the extent Alvarez reads pre-*Timmins* law as already articulating the *Timmins* rule, he is wrong; and to the extent *Timmins* broke new ground, qualified immunity must apply.**

Alvarez's clearly-established theory below proceeded on the premise that pre-*Timmins* Tenth Circuit law had already crystallized the rule *Timmins* ultimately announced—namely, that speech "merely concern[ing]" official duties is not pursuant to those duties, *Timmins*, 157 F.4th at 1278 (quoting *Lane*, 573 U.S. at 240).  That premise is incorrect. The more accurate description, supplied by *Timmins* itself, is that the Tenth Circuit's pre-*Timmins* authority "contradict[ed] *Lane*" and had to be repudiated.  157 F.4th at 1281.  Two consequences follow for this case, and Ms. Chellgren prevails on either.

First, on the merits, the analysis in Section II demonstrates that Alvarez's speech was made pursuant to his official duties even under the narrower *Timmins* formulation. *See* § II.B, *supra*. If Ms. Chellgren is correct on the merits under *Timmins*—and she is—then she is necessarily correct under the pre-*Timmins* authority that took an avowedly broader view of when speech is "pursuant to" official duties. *See Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018) ("we have taken a broad view of the meaning of speech that is pursuant to an employee's official duties"); *Brammer-Hoelter*, 492 F.3d at 1203 ("speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform"); *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010). The district court's contrary reading—adopted in Alvarez's briefing below—which treats pre-*Timmins* law as if it already enforced the post-*Timmins* line, is irreconcilable with *Timmins*'s own text. *See* 157 F.4th at 1281 ("this language in our pre-*Lane* cases contradicts *Lane* and is no longer good law").

Second, on the clearly-established prong, the very fact that *Timmins* was necessary to clarify the doctrine confirms the unsettled

state of the law at the relevant time. *See Wilson*, 526 U.S. at 618. If a panel of this Court had to formally realign Tenth Circuit law with *Lane* in late 2025—expressly disapproving *Brammer-Hoelter* and *Sarkar* to do so—a reasonable Assistant Director of Housing and Residence Life in March 2025 cannot be expected to have anticipated and applied that realignment in advance. *See Heard*, 29 F.4th at 1203 (the clearly-established standard is "demanding"). The district court appeared to recognize the same point, observing that, before *Timmins*, this Circuit had "taken a broad view" of pursuant-to-duties speech, and that *Timmins* was needed to "reject[] overly-broad interpretations of *Garcetti*." Aplt. App. 150. That admission cannot be squared with a holding that the post-*Timmins* rule was "clearly established" eight months earlier. *See Reichle*, 566 U.S. at 670 ("This Court's precedents do not satisfy the 'demanding standard' . . . because they offered divergent views.").

> **3. The pre-*Timmins* authority the district court actually invokes—*Garcetti*, *Lane*, and *Klaassen*—speaks only at the highest level of generality and, where particularized at all, supports Ms. Chellgren.**

Stripped of its (acknowledged) reliance on the Tenth Circuit's pre-*Timmins* gloss, the district court's clearly-established analysis comes

down to three pre-*Timmins* authorities: *Garcetti*, *Lane*, and *Klaassen* (a district court case). *See* Aplt. App. 149-51. None carry the day for Alvarez.

*Garcetti* and *Lane* speak only at the level of "broad general proposition[s]" that this Court has repeatedly held insufficient to clearly establish a right. *Mullenix*, 577 U.S. at 12; *Wieber*, 2025 WL 635753, at *7. *Garcetti* itself disclaimed any "comprehensive framework for defining the scope of an employee's duties" and held only that the inquiry is "a practical one," 547 U.S. at 424—a formulation *Timmins* later described as supplying just "limited" guidance, 157 F.4th at 1277. *Lane* reversed an Eleventh Circuit decision that had held a public employee spoke pursuant to his official duties when he gave grand-jury testimony about information he learned at work, 573 U.S. at 239-40; it had nothing to do with media interviews, written media-referral policies, or front-line residence-life staff, and it spoke only in general terms about speech that "merely concerns" the employee's duties. *Id.* at 240. Both decisions thus operate at exactly the altitude at which the Supreme Court has "repeatedly told courts . . . not to define clearly established law." *Mullenix*, 577 U.S. at 12 (cleaned up); *see also White*, 580 U.S. at 79;

*Wesby*, 583 U.S. at 63-64; *Avant*, 104 F.4th at 209-11. Treating those general formulations as "clearly establishing" the unlawfulness of disciplining a proctor for a media interview given in violation of an express media-referral policy is precisely the move *Wieber* forbids: "highly generalized First Amendment principles" cannot "establish that all but the most incompetent officers would have known" their conduct was unlawful in "these circumstances." *Wieber*, 2025 WL 635753, at *7.

*Klaassen* only reinforces Ms. Chellgren's entitlement to qualified immunity. *Klaassen* was decided in 2018—four years after *Lane*—and applied the *Garcetti/Pickering* framework, including *Lane*'s "ordinarily within the scope" clarification, to hold that a tenured KU Medical Center professor's complaints to the Lawrence Journal-World about governance and spending at KUMC were made "pursuant to his official duties." 348 F. Supp. 3d at 1170. The *Klaassen* court reached that result even though the summary judgment record "doesn't establish as an uncontroverted fact that talking to the news media was one of [the professor's] official job duties," *id.*, because his speech "was related to alleged wrongdoing directly impacting his ability to carry out his official duties," *id.* That is a post-*Lane* District of Kansas decision applying the controlling

framework to deny First Amendment protection for press communications by a KU employee criticizing his KU employer about matters within his portfolio—and doing so without the aggravating fact present here: the violation of an express written media-referral policy.

The district court below invoked *Klaassen* for precisely that proposition: that "speech related to plaintiff's ability to carry out duties is speech pursuant to official duties under *Garcetti* and *Pickering*." Aplt. App. 151. *Timmins* did not disturb Klaassen's outcome on facts like these. Although *Timmins* rejected the defendants' broader contention that audience is unimportant whenever speech "relate[s] to wrongdoing directly impacting [the employee's] ability to carry out [her] official duties," 157 F.4th at 1281, it did so on materially different facts—a general counsel who, unlike Alvarez, was bound by a duty of confidentiality and went to the press about her client's alleged malfeasance, not in violation of an express media-referral policy. *Id.* at 1280-81. Timmins thus left intact the more particularized point Klaassen stands for: when a public employee criticizes his own department in the press about matters squarely within his employment portfolio, that speech can fall within his official duties. The existence of an on-point

District of Kansas decision applying *Garcetti* and *Lane* to at least somewhat similar facts—a KU employee criticizing his KU employer in the press about matters within his job portfolio—and reaching the opposite result for the employee, means the unlawfulness of Ms. Chellgren's conduct was not "beyond debate." *Mullenix*, 577 U.S. at 12; *see Wilson*, 526 U.S. at 618 ("If judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy.").

No Tenth Circuit decision applying *Garcetti* or *Lane* prior to March 2025 addresses a public employee who: (i) was bound by an express written media-referral policy, (ii) admitted in advance that the policy prohibited the very conduct at issue, (iii) gave the interview while identifying himself in his employee role, and (iv) publicly announced his refusal to enforce a policy of his employing department. Without authority addressing that combination of facts—or any reasonable subset of them (to be clear, Alvarez hasn't offered a case with a single one of those present)—the alleged right was not "sufficiently clear that every reasonable official would have understood that what [Ms. Chellgren was] doing violate[d] that right." *Mullenix*, 577 U.S. at 11 (cleaned up). To

the extent the order suggests otherwise by reading the pre-*Timmins* case law to articulate a narrower, *Timmins*-style rule, that reading is contradicted by *Timmins* itself. *See* 157 F.4th at 1281. And to the extent that supposed pre-existing rule differs from what the Tenth Circuit had actually said, the difference is a marker of unsettled doctrine—which is exactly when qualified immunity must apply. *See Reichle*, 566 U.S. at 670; *Wilson*, 526 U.S. at 618.

*       *       *

This is the paradigmatic qualified-immunity case. Alvarez asks this Court to hold that a frontline housing administrator should have known, in March 2025, that disciplining a proctor for a media interview—given in violation of an express media-referral policy, with the employee identifying himself as a proctor, criticizing his own department's policy, and publicly declining to enforce it—was forbidden by the First Amendment. No case said so before Ms. Chellgren acted. No case said so when she acted. And the only case Alvarez and the district court can muster on any related issue, *Timmins*, came eight months after she acted—and even *Timmins*, properly read, supports Ms. Chellgren's view of the merits. Qualified immunity exists for exactly this situation: "to

63

protect officers from the sometimes hazy border between excessive and acceptable [conduct]." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (cleaned up); *accord Mullenix*, 577 U.S. at 12. The district court's contrary conclusion should be reversed, and Count Two should be dismissed on qualified-immunity grounds.

## CONCLUSION

This Court should reverse the district court's Order in part and remand the case with instructions to dismiss the remaining claim against Ms. Chellgren based on qualified immunity.

June 25, 2026

Respectfully submitted,

/s/ MICHAEL T. RAUPP
MICHAEL T. RAUPP
DEREK T. TEETER
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
michael.raupp@huschblackwell.com

*Attorneys for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Ms. Chellgren respectfully submits that oral argument would materially assist the Court. This interlocutory appeal raises important questions concerning the application of the *Garcetti/Pickering* official-duties analysis to a public employee's media interview given in violation of an express written media-referral policy, and concerning the clearly-established prong of qualified immunity in light of this Court's recent decision in *Timmins v. Plotkin,* 157 F.4th 1275 (10th Cir. 2025). Because the appeal implicates Ms. Chellgren's individual liability and presents issues likely to recur in the public-employment context, oral argument would aid the Court's resolution of both prongs of the qualified-immunity inquiry.

June 25, 2026

Respectfully submitted,

/s/ MICHAEL T. RAUPP
MICHAEL T. RAUPP
DEREK T. TEETER
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone (816) 983-8000
Facsimile (816) 983-8080
michael.raupp@huschblackwell.com

*Attorneys for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limitation of Fed. R. App. P. 32(g) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X] this document contains 12,896 words, or

    [ ] this brief uses a monospaced typeface and contains ___ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font, or

    [ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Dated: June 25, 2026                    /s/ MICHAEL T. RAUPP
                                        MICHAEL T. RAUPP
                                        *Attorney for Defendant-Appellant*
                                        4801 Main Street, Suite 1000
                                        Kansas City, MO  64112
                                        Telephone (816) 983-8000
                                        michael.raupp@huschblackwell.com

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, SentinelOne, most recently updated on June 25, 2026, and according to the program are free of viruses.

Dated:  June 25, 2026

/s/ Michael T. Raupp
Michael T. Raupp
*Attorney for Defendant-Appellant*
4801 Main Street, Suite 1000
Kansas City, MO  64112
Telephone (816) 983-8000
michael.raupp@huschblackwell.com

# CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will send notification to all counsel and parties receiving electronic notice.

Dated: June 25, 2026

/s/ MICHAEL T. RAUPP
MICHAEL T. RAUPP
*Attorney for Defendant-Appellant*
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone (816) 983-8000
michael.raupp@huschblackwell.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| ANTHONY ALVAREZ, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 25-2281-KHV |
| | ) | |
| EMILY CHELLGREN in her individual | ) | |
| capacity and SARAH WATERS in her individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

On July 15, 2025, Anthony Alvarez filed his first amended complaint against Emily Chellgren and Sarah Waters in their individual capacities, alleging that in violation of 42 U.S.C. §1983 et seq., they (1) implemented a policy restricting media communication (Count One), (2) retaliated based on First Amendment speech (Count Two) and (3) denied him procedural due process under the Fourteenth Amendment (Count Three).  This matter is before the Court on Defendant Emily Chellgren's Motion To Dismiss (Doc. #21) and Defendant Sarah Waters' Motion To Dismiss (Doc. #23), both filed September 15, 2025.  For reasons stated below, the Court sustains Chellgren's motion in part and Waters' motion in full.

**Legal Standards**

Defendants seek to dismiss plaintiff's complaint under Rule 12(b)(6), Federal Rules of Civil Procedure.  In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim

**Att. 1**

which is plausible—and not merely conceivable—on its face.  Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.  See id.; United States v. Herring, 935 F.3d 1102, 1110 (10th Cir. 2019).  Plaintiff bears the burden of framing his claims with enough factual matter to suggest that he is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  See Twombly, 550 U.S. at 556.  Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct.  Iqbal, 556 U.S. at 678.  Plaintiff must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendants' liability.  Id. (quoting Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Id.  Similarly, where the well-pleaded facts do not permit the Court to infer more than mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case.  Robbins v. Okla., 519 F.3d 1242, 1248 (10th Cir. 2008).

When considering a motion to dismiss under Rule 12(b)(6), the Court generally must disregard all documents other than the complaint.  Jackson v. Integra Inc., 952 F.2d 1260, 1261 (10th Cir. 1991).  The Court may consider documents outside the complaint, however, when they are central to plaintiff's claims and are referred to in the complaint.  GFF Corp. v. Associated

**Att. 2**

Wholesale Grocers, 130 F.3d 1381, 1384 (10th Cir. 1997).

## Factual Background

Plaintiff's first amended complaint alleges as follows:

Plaintiff is a student at the University of Kansas ("KU").  During the 2024–25 school year, KU employed plaintiff as a proctor—a position similar to a resident assistant—in KU's Grace Pearson Scholarship Hall.

On February 27, 2025, the KCUR news service published an article entitled "KU students protest housing changes they say will harm trans and nonbinary residents."  The article detailed KU policy changes in response to recent state and federal legislation which would become effective in the following school year.  As part of those changes, Grace Pearson Scholarship Hall announced that it would eliminate gender-neutral bathrooms and gender-inclusive room assignments and require students to use bathrooms that aligned with the genders listed in their KU student files.

The reporter interviewed plaintiff and quoted him in the article.  The first paragraph identified plaintiff as a student who had lived at Grace Pearson for three years.  It also identified plaintiff as transgender, lending credibility to his statements on the impact of the policy changes on LGBTQ+ individuals.  The article later detailed that during his time at Grace Pearson, plaintiff worked as a proctor.  The article did not identify plaintiff as a representative or speaker on behalf of KU Housing and Residence Life.[1]

---

[1] The first amended complaint does not further allege what the article quoted plaintiff as saying.  The first amended complaint refers to the article, and the article is central to plaintiff's claims, so the Court considers it in ruling on defendants' motions to dismiss.  See Associated Wholesale Grocers, 130 F.3d at 1384.

The article quotes three transgender students.  See KU Students Protest Housing Changes They Say Will Harm Trans And Nonbinary Residents, KUCR,

(continued. . .)

-3-

**Att. 3**

Eight days later, on March 7, 2025, plaintiff met with Emily Chellgren, former Assistant Director of KU Housing and Residence Life, and the director of Grace Pearson.[2]  During that meeting, Chellgren and the director placed plaintiff on probation until March 13.  On March 13, plaintiff received a hand-delivered letter from Chellgren which detailed their meeting on March 7.  The letter detailed three topics they had discussed, which all related to plaintiff's comments in the article.  The letter further detailed two provisions of the "Residence Life 2024–25 Undergraduate Staff Position Description" and implied that through his conduct and providing comment for the article, plaintiff had violated those provisions.  The first provision stated in part that "[Staff will] demonstrate a commitment to personal integrity, such as modeling good judgment, ethical behavior, and adherence to laws and policies."  The second provision stated in part that "[Staff will] refer a student's parents, relatives, friends, and/or the media (press) to [his or her] supervisor. . . [and] [u]nless otherwise designated, the Director of Residence Life in conjunction with KU Strategic Communications & Public Affairs will respond to all media inquiries."  The letter detailed three items to which plaintiff allegedly agreed as part of an "Action Plan" on March 7.  These included directing all media inquiries to his direct supervisor, removing sticky notes from Grace Pearson and submitting a letter to rescind his acceptance of a proctor position which KU had offered him for the following school year at a different residence hall.

---

[1] (. . .continued)
https://www.kcur.org/education/2025-02-27/ku-students-protest-housing-changes-they-say-will-harm-trans-and-nonbinary-residents (last visited March 13, 2026).  The article stated that plaintiff had lived at Grace Pearson for three years and worked as a proctor, which is "similar to a resident assistant."  Id.  The article stated that plaintiff had applied to serve as a proctor in Grace Pearson for the 2025–26 school year, but KU assigned him to a different residence hall because his bosses "weren't confident that [he] would implement the policies that they were going to change at GP" and "were worried [he] was going to be frustrated."  Id.  The article also stated that plaintiff was turning down KU's offer to work at another residence hall.

[2]     The parties do not provide the director's name.

**Att. 4**

On March 14, Chellgren informed plaintiff that effective that day, KU had terminated his employment. Chellgren copied her supervisor, Sarah Waters, Executive Director of KU Housing and Residence Life, on the termination letter. Chellgren stated that KU had terminated plaintiff's employment because of (1) the conduct which had led to his probationary status—speaking to a member of the press; and (2) additional policy violations which had occurred since the meeting on March 7. The letter informed plaintiff that he would lose his compensation, his room in Grace Pearson and the meal plan associated with his position as proctor. The letter stated that plaintiff had until Friday, March 21 to vacate Grace Pearson. Effective immediately, he could not be in the building until he scheduled a move-out time so Chellgren could escort him through the building. The letter further informed plaintiff that if he lived on campus during the 2025–26 school year, he could not live in any scholarship hall.

In response to defendants' motions to dismiss, plaintiff has abandoned Counts One and Three of his first amended complaint.[3] The Court therefore dismisses Counts One and Three and

---

[3]    Count One alleges that defendants violated Section 1983 by maintaining and enforcing a policy and practice that required Residence Life student employees to refer media and press inquiries to a supervisor in a manner which appeared to entirely restrict their ability to speak to the media. Plaintiff claims that this policy (1) functioned as a prior restraint on speech and imposed content-based and viewpoint-based restrictions on a public employee in violation of the First Amendment; (2) was overbroad on its face because it restricted protected speech, including speech by employees in their capacities as private citizens on matters of public concern; and (3) was impermissibly vague, leaving students and employees unclear and uncertain as to what speech was prohibited, when restrictions applied and what circumstances—if any—allowed for media engagement. Regarding Count One, plaintiff "is not contesting the defenses lodged in Defendant's Memorandum in Support with regard to Count I, the facial constitutional challenge to the policy at issue." Plaintiff's Memorandum In Opposition To Defendant Emily Chelgren's Motion To Dismiss (Doc. #32) at 4. Plaintiff does not respond to defendants' argument that any "as-applied" challenge would duplicate his First Amendment retaliation claim and he has therefore abandoned that theory of relief.

Count Three alleges that in violation of Section 1983, defendants violated his right to procedural due process under the Fourteenth Amendment. Specifically, plaintiff claims that as an employee at a public university, he had a property interest in continued employment and was

(continued. . .)

**Att. 5**

confines its analysis to Count Two.

Count Two alleges that in violation of Section 1983, defendants retaliated against plaintiff for engaging in speech which the First Amendment protects.  Plaintiff claims that he engaged in protected speech by speaking to a member of the media in his capacity as a private citizen on a matter of public concern—specifically, by criticizing KU policies and practices related to housing policies for LGBTQ+ community members pursuant to recent state and federal legislative directives.

<u>**Analysis**</u>

Defendants argue that the Court should dismiss Count Two because (1) plaintiff does not state a claim on which relief can be granted for First Amendment retaliation and (2) both defendants have qualified immunity.  In addition, Waters argues that the first amended complaint mentions her only six times in mostly passive settings, which does not state a claim or overcome

---

[3] (. . .continued)
entitled to due process before being terminated, that defendants failed to provide plaintiff complete notice of his right to appeal and an opportunity to be meaningfully heard prior to the termination. In addition, plaintiff claims that defendants terminated his employment before his time to appeal his probationary status had closed.  Regarding Count Three, plaintiff states that he "is not contesting Defendant's arguments as to his procedural due process claim" and that "[d]efendant is likely correct that the Kansas Judicial Review Act was the correct vehicle for appealing his termination." <u>Id.</u> at 11.

Plaintiff adds, however, "[i]f the Court would permit leave to amend the pleadings to make a claim under the [Kansas Judicial Review Act], Plaintiff would gladly entertain the chance to appeal the termination decision." <u>Id.</u>  The Court disregards any motion or request to amend which does not comply with District of Kansas Rule 15.1(a).  Under that rule, a party filing a motion to amend that may not be filed as a matter of right must (1) set forth a concise statement of the amendment or leave sought; (2) attach the proposed pleading or other document; and (3) attach a redlined version of the proposed amendment that shows all proposed changes to the pleading.  D. Kan. R. 15.1(a); <u>see</u> <u>Requena v. Roberts</u>, 893 F.3d 1195, 1204 n.3 (10th Cir. 2018) (insufficient to merely suggest that party should be allowed to amend if judge finds pleadings deficient; party must file written motion for leave to amend, giving adequate notice of basis of proposed amendment). Because plaintiff has not satisfied any of these requirements, the Court overrules his imbedded request to amend the complaint.

**Att. 6**

qualified immunity.

## I.   Claims Against Emily Chellgren In Her Individual Capacity

### A.   Whether Plaintiff States A First Amendment Retaliation Claim Against Chellgren

Plaintiff claims that Chellgren terminated his employment because he engaged in speech which the First Amendment protects.  Chellgren argues that plaintiff fails to state a claim because his speech related to his role as a proctor, so he made his speech pursuant to his official duties and the First Amendment did not protect it.  In response, plaintiff argues that his job duties as a proctor did not include speaking to the media or similar tasks, so his speech was not pursuant to his official duties.  In reply, Chellgren argues that plaintiff's speech was pursuant to his official duties because it owed its existence to his role as proctor, criticized the University's policy and made clear that he would not enforce the policy.

To evaluate whether a public-employee plaintiff has established a prima facie case of First Amendment retaliation, the Court applies a test derived from Supreme Court decisions in Garcetti v. Ceballos, 547 U.S. 410 (2006), and Pickering v. Board of Education, 391 U.S. 563 (1968).  For a public employee to state a prima facie case, he must establish five elements: (1) the protected speech was not made pursuant to his official duties; (2) the protected speech addressed a matter of public concern; (3) the government's interests as an employer did not outweigh the employee's free-speech interests; (4) the protected speech was a motivating factor in the adverse employment action; and (5) defendant would not have made the same employment decision in the absence of the protected speech.  Timmins v. Plotkin, 157 F.4th 1275, 1277 (10th Cir. 2025); see Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1250 (10th Cir. 2024).  As mentioned above, defendant contests only the first element: whether plaintiff's speech to the media was pursuant to his official duties.  If plaintiff made his speech pursuant to his official duties, the First Amendment does not protect

-7-

**Att. 7**

it, and plaintiff fails to state a claim.

In determining whether speech was pursuant to an employee's official duties, "[t]he critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of the employee's duties, not whether it merely concerns those duties." Timmins, 157 F.4th at 1277–78 (quoting Lane v. Franks, 573 U.S. 228 (2014)). The Tenth Circuit takes a "practical view of all the facts and circumstances surrounding the speech and the employment relationship." Id. at 1280 (quoting Knopf v. Williams, 884 F.3d 939, 946 (10th Cir. 2018)). The Court considers facts such as the tasks in the employee's job description, the frequency with which the employee performs a task, the subject matter of the employee's speech, the recipient of the employee's speech and the legal obligation for the employee to speak, but no one fact is determinative. Id.

The fact that the employee's speech "owes its existence to" or "relates to" his employment does not mean that he speaks pursuant to his official duties. Id. (quoting Lane, 573 U.S. at 239). An employee speaks pursuant to his official duties when the speech "stem[s] from" and is "the type of activity [he] is paid to do." Id. (quoting Tufaro v. Okla. ex rel. Bd. of Regents of the Univ. of Okla., 107 F.4th 1121, 1139 (10th Cir. 2024)). The "mere fact that a citizen's speech concerns information acquired by virtue of [his] public employment does not transform that speech into employee—rather than citizen—speech." Id. (quoting Lane, 573 U.S. at 240).

Here, the first amended complaint does not allege that plaintiff's job duties as a proctor involved speaking to the press about Grace Pearson policies, or that KU paid him to do similar tasks.[4] In fact, the first amended complaint alleges that KU policy prohibits proctors from speaking

---

[4]    Exhibits A and B, the probation and termination letters from Chellgren to plaintiff, make statements about plaintiff's job duties. The letters claim that plaintiff's job description required him to "demonstrate a commitment to personal integrity, such as modeling good judgment, ethical behavior, and adherence to laws and policies" and to "[r]efer a student's parents,

(continued. . .)

**Att. 8**

to the press.  Neither the first amended complaint nor the article suggest that plaintiff's speech was pursuant to his employment, and they do not address the many factors that are relevant to that question.  See Timmins, 157 F.4th at 1280 (factors include job description, frequency employee performs task, subject matter of speech, recipient of speech and employee's legal obligation to speak).

Chellgren argues that plaintiff's job duties included "enforcing University of Kansas and KU Housing & Residence Life regulations and policies," which included Grace Pearson's new bathroom policy.  Chellgren argues that plaintiff criticized and indicated his unwillingness to enforce the policy, so his speech must have been pursuant to his official duties.

This argument cannot withstand even superficial analysis.  First, the article does not quote plaintiff as indicating that he was unwilling to enforce the new policies, and the record contains no basis for Chellgren's claim in that regard.  Second, the policy changes which plaintiff addressed had not gone into effect at the time of his speech.  They were effective the following school year (2025–26), and KU apparently had no plans to employ plaintiff at Grace Pearson during that school year.[5]  According to the article, the proposed policies were specific to Grace Pearson, and because plaintiff was not going to work there, he had no job duty to enforce the new policies.  Thus, plaintiff was not responsible for enforcing the new policies and was never going to be responsible for doing so.

---

[4] (. . .continued)
relatives, friends, and/or the media (press) to [his] supervisor."  Chellgren argues that the Court can consider the letters because the first amended complaint refers to and relies on them.  The letters are not, however, "central" to plaintiff's claim.  See Associated Wholesale Grocers, 130 F.3d at 1384; Hampton v. root9B Techs., Inc., 897 F.3d 1291, 1297 (10th Cir. 2018).  Also, to the extent they purport to describe plaintiff's job duties, these statements appear to be hearsay.

[5]     KU had offered plaintiff a position in another residence hall for 2025–26.

-9-

**Att. 9**

Therefore, defendant is not entitled to dismissal on the ground that plaintiff's speech was pursuant to his official duties.  Count Two states an actionable claim for First Amendment retaliation.

B.        Whether Chellgren Has Qualified Immunity

Chellgren argues that she is entitled to qualified immunity on Count Two.  Plaintiff disagrees, arguing that she violated his clearly established right to be free from retaliation for exercising his First Amendment right to free speech.

Qualified immunity shields government officials from liability for performing discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Defendants who assert qualified immunity—including in a motion to dismiss—are presumptively immune from suit.  Cuervo v. Sorenson, 112 F.4th 1307, 1314 (10th Cir. 2024).  On a motion to dismiss, plaintiff can overcome the presumption if he establishes that the complaint alleges factual content from which the Court can reasonably infer that (1) defendant's conduct violated a constitutional right and (2) that right was clearly established at the time of the alleged violation.  Id.; see Iqbal, 556 U.S. at 678.

Whether a right is "clearly established" is an objective test.  A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1196–97 (10th Cir. 2010)).  A constitutional right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Heard v. Dulayev, 29 F.4th 1195, 1203 (10th Cir. 2022) (citations omitted).  Under this demanding

-10-

**Att. 10**

standard, the alleged violation "must have a sufficiently clear foundation in then-existing precedent" either with "controlling authority or a robust consensus of cases of persuasive authority." Id. (citations omitted).

The Supreme Court has warned against defining a clearly established right "at a high level of generality" and emphasized that the law must be "particularized to the facts of the case," but this does not mean that a right is only clearly established if a case exists that is factually identical. Est. of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (citations omitted).  This makes good sense: if a right is clearly established only when a prior case presents identical facts, qualified immunity would apply under every different fact pattern.  Under this standard, officials would always be entitled to qualified immunity so long as their actions—no matter how outrageous or harmful—were sufficiently novel.  While the case need not be directly on point, the "existing precedent must place the lawfulness of the defendant's conduct beyond debate."  Heard, 29 F.4th at 1203 (citations and brackets omitted).

Here, as explained above, plaintiff has stated a claim that defendant's conduct violated his First Amendment rights, so the Court must determine whether his right was clearly established at the time of defendant's actions.  This determination turns on whether the law clearly established that the type of speech which the first amended complaint alleges was not pursuant to plaintiff's official duties, i.e. that plaintiff spoke as a private citizen rather than as a public employee.

The Supreme Court has long established that speech by citizens on matters of public concern lies at the heart of the First Amendment, even when such speech concerns information related to or learned through public employment.  Lane, 573 U.S. at 236.  In Garcetti and Pickering, the Supreme Court held that the fact that speech concerns the subject matter of plaintiff's employment is not dispositive, and that the "First Amendment protects some expressions related

-11-

**Att. 11**

to the speaker's job." Garcetti, 547 U.S. at 421. In Garcetti, the Supreme Court clarified that the controlling factor is whether the speech is made pursuant to the employee's duties, i.e. if the speech is part of what he "was employed to do" and "paid to perform." Id. In Lane, the Supreme Court further clarified that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." Lane, 573 U.S. at 236. The critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties. Id. at 239.

In November of 2025 (after Chellgren's conduct took place), the Tenth Circuit rejected overly-broad interpretations of Garcetti by clarifying and applying principles which the Supreme Court established in Lane. See Timmins, 157 F.4th 1275. Before Timmins, Tenth Circuit precedent had "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." Knopf, 884 F.3d at 945 (citing Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 713 (10th Cir. 2010)). The Tenth Circuit had held that "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007).

Chellgren argues that until it decided Timmins in November of 2025, the Tenth Circuit had no clearly established law whether plaintiff's speech was pursuant to his official duties. Chellgren argues that to defeat qualified immunity, plaintiff must cite a case which holds that a proctor who publicly discusses his unwillingness to enforce a policy which his job requires him to enforce is not speaking pursuant to his official duties. Plaintiff responds that at the time of defendant's actions, Garcetti (2006) and Lane (2014) clearly established that he spoke not pursuant to his

-12-

**Att. 12**

official duties, but as a citizen.  Defendant replies that Tenth Circuit precedent prior to Timmins misread Garcetti and defined "pursuant to official duties" to broadly include speech that merely concerned employees' duties—which plaintiff's speech did.  Chellgren concludes that reasonable officials in her position would not have known that it was unconstitutional to terminate plaintiff's employment for speech in which a proctor publicly declared his refusal to enforce residence hall policies which his job duties required him to enforce.

Again, this argument misses the mark.  The policy changes which plaintiff spoke about were not in effect when he spoke, and according to the first amended complaint and the article, he turned down KU's offer of employment for the school year when they would become effective.  KU never employed plaintiff to enforce the new policies.  Therefore, whatever the state of Tenth Circuit precedent, plaintiff's speech did not concern any duty to enforce the new policies.  At most, plaintiff's speech concerned *future* duties that KU might require him to perform if he were to accept a different proctor job the following year.  Even before Timmins, the law was clearly established that an employee does not speak pursuant to his official duties when his job duties do not require such speech (or similar activity) and his speech does not concern his duties.  See Klaasen, 348 F. Supp. 3d at 1170 (speech related to plaintiff's ability to carry out duties is speech pursuant to official duties under Garcetti and Pickering).

Thus, Chellgren is not entitled to dismissal based on qualified immunity.

## II.     Claims Against Sarah Waters In Her Individual Capacity

Waters argues that first amended complaint fails to state a claim against her because it mentions her only six times and does so mostly in passive settings (such as Chellgren copying her on email) and lacks specific and particularized allegations about what she supposedly did to plaintiff.  Waters argues that she cannot determine whether plaintiff alleges that she was personally

**Att. 13**

involved in the probation and termination decisions or is responsible merely as a supervisor.  In response, plaintiff clarifies that he is making a supervisory liability claim.  Plaintiff argues that his first amended complaint provides Waters with notice that he is alleging that she was involved in his termination.  Waters responds that the first amended complaint contains no facts—as opposed to legal conclusions—which suggest that she retaliated against plaintiff in any way.

Section 1983 does not authorize respondeat superior liability for a supervisor based solely on the actions of her subordinates.  Burke v. Regalado, 935 F.3d 960, 997 (10th Cir. 2019).  To establish a claim against defendant in her personal capacity based on her supervisory responsibilities, plaintiff must show (1) personal involvement, (2) causation and (3) state of mind.  Id.; see Brown v. Montoya, 662 F.3d 1152, 1163 (10th Cir. 2011) (to establish personal capacity supervisory liability, plaintiff must show that defendant (1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm and (3) acted with the state of mind required to establish the alleged constitutional deprivation).

The first amended complaint alleges that Waters (1) was the Executive Director of KU Housing and Residence Life and (2) was copied on plaintiff's termination letter.  It does not allege facts which show that she was personally involved in the continued operation of any policy or acted with any specific state of mind.  Thus, the first amended complaint fails to state a supervisory liability claim against Waters.  See Kidwell v. Hayden, No. 20-3238-SAC, 2020 WL 6044100, at *2 (D. Kan. Oct. 13, 2020) (bare claims of involvement not sufficient to state claim for relief; plaintiff must describe specific acts by each defendant that violated constitutional rights).

Accordingly, the Court dismisses plaintiff's claims against Waters for failure to state a claim for relief.

**Att. 14**

Att. 15

**IT IS THEREFORE ORDERED** that <u>Defendant Emily Chellgren's Motion To Dismiss</u> (Doc. #21) filed September 15, 2025 is **SUSTAINED in part.**  Counts One and Three of plaintiff's first amended complaint against Emily Chellgren are dismissed with prejudice, but defendant's motion to dismiss is **OVERRULED** as to Count Two.

**IT IS FURTHER ORDERED** that <u>Defendant Sarah Waters' Motion To Dismiss</u> (Doc. #23) filed September 15, 2025, is **SUSTAINED.**

Dated this 18th day of March, 2026 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-15-